UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

*Electronically Filed*

JANICE SWEET,
As Personal Representative and
Administrator of the Estate of
CHRISTOPHER SWEET, and Next Friend
to the Minor Children H.N.S. and A.A.S.,

    Plaintiff

v.

                                CASE NO.:   4:19-cv-00009-TWP-DML

SHERIFF JAMEY NOEL,
CLARK COUNTY SHERIFF'S DEPT.,
CHARLESTOWN PRIMARY CARE, LLC,
WILLIAM HOKE, M.D., et al.,

    Defendants

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT, MICHAEL LOONEY'S, MOTION FOR SUMMARY JUDGMENT

Defendant, Michael Looney ("Looney"), by counsel, and for his Memorandum of Law in Support of his Motion for Summary Judgment, hereby states as follows:

### INTRODUCTION

The Plaintiff filed this action against Looney, in his individual capacity, alleging Looney's actions on May 27 and May 28, 2017 as a corrections officer working in the Clark County Jail were objectively unreasonable and Looney's objectively unreasonable conduct violated Christopher Sweet's constitutional rights and caused his death. The undisputed material facts show Looney's conduct was not objectively unreasonable and he is insulated from liability by qualified immunity. Accordingly, Looney requests the Court grant his Motion for Summary Judgment.

1

**STATEMENT OF MATERIAL FACTS NOT IN DISPUTE**

Looney expressly adopts and reiterates herein the "Statement of Material Facts Not in Dispute contained in Sheriff Jamey Noel's Memorandum in Support of Summary Judgment and evidence designated in support of same. For ease of reference, Sweet's interactions with Looney are detailed below:

Sweet arrived at the jail at approximately 7:00 p.m. and Looney performed a physical and pat down of Sweet's person asking Sweet questions concerning his medical status, including whether he had any allergies or took any medications. (Looney, p. 24 ll. 21-p. 29 ll. 6; **Exhibit D**, 7:02-7:06; Smith, p. 68 ll. 24-p. 70 ll. 13.) Sweet replied he had been prescribed anxiety and blood pressure medications. *Id.* Looney asked Sweet whether he had any medical problems to which Sweet responded "just hypertension and blood pressure." *Id.* Sweet denied being under the influence of any illegal drugs or drugs other than those prescribed. *Id.* At no point did Sweet indicate he had chest pain or was in need of emergent medical assistance. *Id.* Sweet had no medical complaints or requests for assistance and was seemingly focused on ensuring his fiancé did not gain access to his vehicles and was not permitted to drive said vehicles. *Id.* Had Sweet requested medical help, the officers would have called the Jail's on-call medical staff (which consisted of whichever of the Jail's three LPNs was on call and the jail physician) but since he did not, he was taken to an intake cell to wait until he was booked into the facility. (Looney, p. 27 ll. 5- p. 33 ll. 25; Smith, p. 68 ll. 24-p. 70 ll. 13.)

At 8:15 p.m., Sweet was "booked" into the jail—a process which involved advising Sweet of his charges, asking standard questions concerning his medical status, and taking an inventory of his possessions, among other things. (Noel, p. 8 ll. 13-24; Looney, p. 27 ll.5-p.33 ll.25; **Exhibit F**; **Exhibit G**, **Exhibit H**, **Exhibit I**.) A preliminary medical screen was

completed during which it was noted Sweet had blood pressure issues and listed his prescribed medications. As a result of the book-in process Sweet received 24/7 access to an electronic "kiosk" system, wherein he could request medical care or nursing/physician appointments, if needed. (Looney, p. 25 ll. 4-ll. 23, p. 29 ll. 2-p. 30 ll. 17; Exhibit H; **Exhibit J**, p. 13-15; Noel, p. 105 ll. 1-p. 107 ll.1; Hammond, p. 77 ll. 7-p. 82 ll. 9, p. 84 ll. 19-p. 91 ll. 8, p. 93 ll. 4-p. 93 ll. 18; Smith, p. 70 ll. 14-p. 74 ll. 10, 77 ll. 13-p. 80 ll. 16.) Sweet never made a request for medical care via the kiosk or asked to see a physician.[1]

In addition, as part of the typical book-in process, booking officers will communicate any medical issues to the supervising officers who contact the proper medical or psychiatric staff. *Id.* Supervisors and officers higher on the chain of command (discussed below) are adept at identifying which medicines need to be dispensed immediately versus which medications can wait until a medical staff is on duty. *Id.* Staff works with detainees to then obtain any required prescribed medications and permits detainees to contact their family members to request medications be dropped off for administration and did so in this instance. (Looney, p. 29 ll. 2-p. 30 ll. 17; Noel, p. 105 ll. 1-p. 107 ll.1; Hammond, p. 77 ll. 7-p. 82 ll. 9, p. 84 ll. 19-p. 91 ll. 8, p. 93 ll. 4-p. 93 ll. 18.)

On May 28, 2017, Officer Looney arrived to his shift at the Clark County Jail at approximately 1:52 p.m. at which time his supervisor instructed him to have all detainees not in jumpsuits be changed into jumpsuits. (**Exhibit T**.) At approximately 2:18 p.m., Officer Looney took Sweet to be "dressed out" per his supervisor's instructions. (Looney, p. 34 ll. 8-p. 36 ll. 25, p. 52 ll. 16-p. 54 ll. 12; **Exhibit Y**.) Looney did not know whether Sweet had

---

[1] LPNs frequently reviewed reports from these kiosk, assessed detainees' medical complaints and, if necessary either contacted the physician, put the complaining detainee on a list to see the jail physicians who visited the jail once a week or, if the medical situation could not wait until the doctor's weekly visit to the Jail, sent them to the emergency room. *Id.* The LPNs typically scheduled every detainee that wanted to see the doctor a doctor visit, though there were times that they denied detainees doctors' visits. (Hammond, p. 94 ll. 16-p. 96 ll. 4.) In the event inmates disputed the denial of a doctors' visit, there was a grievance procedure they had access to via the same kiosk system. *Id.*

3

been taken off medical watch and his supervisor's instructions to have Sweet change clothes and his notation on the segregation blotter of "move" was not indicative that he was being moved out of segregation—rather, he "went down his list" and "dressed out" detainees based upon the time they were brought into the jail. *Id.* According to Smith and Hammond, Sweet was not (nor was he ever during his stay at the Jail) being moved from medical segregation to general population. (Smith, p. 86 ll. 3-p. 87 ll. 18.)

Most of this exchange was captured on video and shows Looney escorting Sweet to the counter, then asking Sweet to stay at the counter while he retrieved him a jumpsuit and a towel. (Looney, p. 51 ll. 1-ll. 17.) Sweet requested a smaller jumpsuit to which Looney replied to try the one he got first and they'd go from there. *Id.* Sweet went into the bathroom and changed clothes. When he returned he stated that the jumpsuit fit fine. *Id.* Once Sweet changed into a jumpsuit, Looney escorted him back to the medical segregation cell. *Id.* At some point during Looney's interaction with Sweet at this time, but when the interaction was not on camera, Looney, in an effort to be friendly, asked Sweet how he was doing today, to which Sweet responded, "I feel like an elephant is on my chest, but other than that, I'm okay." (Looney, p. 51 ll. 18-p. 52 ll. 17.) Looney interpreted that as Sweet saying he was okay and did not report that comment to anyone, "since he told [him] he was fine." *Id.* During this exchange, Looney did not observe Sweet rubbing his chest, breathing heavily, sweating or engaging in any behavior that led Looney to believe, based upon his First Aid and CPR training that Sweet was medically distressed or in need of emergent care. (**Exhibit LL**.) At no point did Sweet request to see a doctor or nurse. *Id.*

4

Sweet collapsed approximately an hour later, at which time Looney ran into his cell and assisted officers in rendering aid, assistance and CPR to Sweet until EMS arrived.[2] (**Exhibit Z**; Looney, p. 54 ll. 13-p. 67 ll. 12; **Exhibit AA**; Beard, p. 26 ll. 14-p. 29 ll. 5, p. 38 ll. 16-p. 48 ll. 12; **Exhibit BB**; **EXHIBIT CC; EXHIBIT DD**.)  EMS transported Sweet to Clark Memorial Hospital where he was in cardiac arrest and ultimately pronounced dead. (Clark Memorial Hospital Records, designated as **EXHIBIT EE**.)

At the time of the events in question, Looney had been a corrections officer at the Jail for 1-2 months, and had undergone field training, had reviewed all the Jails' policies, was trained on medical screening protocols, was CPR and First Aid certified and received in-house training concerning potential emergency situations from his supervisors during on-the-job training and shadowing real life scenarios. (Looney, p. 4 ll. 20-ll. 25, p. 18 ll. 14-p. 20 ll. 25, p. 21 ll. 1-ll. 13, p. 23 ll. 23-p. 24 ll. 6, p. 37 ll. 5-p. 43 ll. 14, p. 39 ll. 6-p. 43 ll. 14.)   He had not completed his "pre-basic" course, as said course is only offered by the state at certain time periods, though the other officers above him in the chain of command had taken that course and were trained in those areas. *Id.*  He ultimately completed this course as required where he received training on transferring detainees to appropriate medical facilities or healthcare providers, as well as training on chemical dependency, emotional disturbance, developmental disability and mental retardation. *Id.*

Corrections Expert, Edward Sweeney, found that Michael Looney met all applicable standards of care, which has been un-rebutted by any Plaintiff's experts. (**Exhibit JJ**.)

### SUMMARY JUDGMENT STANDARD

---

[2] Plaintiff's expert testified that if EMS had been called after Sweet's collapse while he was at home, versus when he was at the jail, the same course of medical treatment would have occurred. (Rinder, p. 82 ll. 8-ll.24.) Plaintiff's other expert agreed that the jail staff was immediately responsive to Sweet collapsed. (Dr. Roscoe, p. 128 ll. 1-p. 134 ll. 15.)  That expert was critically only of the officers' inability to locate the face barrier for CPR but again, issued no causation opinions. *Id.*

5

Summary judgment is proper when there is no genuine issue as to any material fact because the non-moving party has failed to establish the existence of an essential element of its case, as to which that party would bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Hummel v. St. Joseph Cnty. Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016). Federal Rule of Civil Procedure 56 imposes an initial burden of production on the party moving for summary judgment to inform the district court why a trial is unnecessary. *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013) (citing *Celotex Corp.*, 477 U.S. at 323). The moving party may discharge this initial responsibility by simply "'showing' - that is, pointing out to the district court - that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. When the nonmoving party would have the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Id.* at 323, 325.

Once a properly supported motion for summary judgment is made, the non-moving party cannot resist the motion and withstand summary judgment merely by resting on its pleadings. *See* Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324. If a party "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may... consider the fact undisputed for purposes of the motion [or] grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show the movant is entitled to it…." Fed. R. Civ. P. 56(e)(2), (3); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50 (1986). The non-movant must make a showing sufficient to establish the existence of an element essential to its case. *Id.* In other words, non-movants must "go beyond the pleadings (*e.g.,* produce affidavits, depositions, answers to interrogatories, or admissions on file) to demonstrate there is

6

evidence 'upon which a jury could properly proceed to find a verdict' in [their] favor." *Modrowski*, 712 F.3d at 1169 (quoting *Anderson*, 477 U.S. at 251).

## ARGUMENT

**I.   Plaintiff's § 1983 Claim against Looney should be Dismissed as a Matter of Law.**

### A. Looney did not Violate Sweet's Constitutional Rights

The inquiry for evaluating a pretrial detainee's due process challenge to his medical care is two-fold. *Vale-Gugliuzzi v. Layton*, 2020 WL 3510774, at *6-7 (S.D. Ind. June 29, 2000)(citing *McCann v. Cty. Of Lake*, 900 F.3d 335, 352 (7th Cir. 2018)). The first step "asks whether to . . . defendants acted purposefully, knowingly, or perhaps even recklessly when they considered the consequences of their handling of [plaintiff's] case." *Id.* (quoting *Miranda v. Cty. Of Lake*, 900 F.3d 335, 352 (7th Cir. 2018)). Neither a showing of negligence nor gross negligence will suffice. *Id.* The second step asks whether the conduct was objectively reasonable. *Id.* Courts must look to "the totality of facts and circumstances faced by the individual alleged to have provided inadequate medical care and... gauge objectively— without regard to any subjective belief held by the individual—whether the response was reasonable. *Id.* (citations omitted). The objective reasonableness standard requires more than medical malpractice and "the state-of-mind requirement for constitutional cases remains higher." *Mayweather-Brown v. Bigler*, 2019 WL 4863454, at *26 (N.D. Ind. Oct. 1, 2019).

A court (judge or jury) cannot apply this standard mechanically. *Kingsley v. Hendrickson*, 576 U.S. 389, 396-97 (2015)(citations omitted). A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight. *Id.* A court must also account for the "legitimate interests that stem from [the government's] need to manage the

7

facility in which the individual is detained," appropriately deferring to "policies and practices that in th[e] judgment" of jail officials "are needed to preserve internal order and discipline and to maintain institutional security." *Id.* (citing *Bell v. Wolfish*, 441 U.S. 520, 540 (1979)). Moreover, it is well-established that non-medical staff who rely on medical experts are "entitled to relegate to the prison's medical staff the provision of good medical care." *Mayweather-Brown v. Bigler*, 2019 WL 4863454, at *32 (N.D. Ind. Oct. 1, 2019)(citing *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009); *Johnson v. Doughty*, 433 F.3d 1001, 1012 (7th Cir. 2006); *see also Figgs v. Dawson*, 829 F.3d 895, 903-04 (7th Cir. 2016)(no deliberate indifference where prison administrative staff reasonably relied on expertise of specialized staff). "Inmate health and safety is promoted by dividing responsibility for various aspects of inmate life among guards, administrators, physicians, and so on. *Rayne v. Gannon*, 2020 WL 2840029, at *9 (S.D. Ind. June 1, 2020). Holding a non-medical jail official liable in a case where a detainee was under medical staff's care would strain this division of labor. *See Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011); *see, e.g., Bond v. Aguinaldo*, 228 F.Supp.2d 918, 920 (N.D. Ill. 2002) ("Except in the unusual case where it would be evident to a layperson that a prisoner is receiving inadequate or inappropriate treatment, prison officials may reasonably rely on the judgment of medical professionals.").

In this case, Officer Looney's asserted liability is premised upon his failure to recognize Sweet's "off the cuff" remark, which was made in passing in response to Officer Looney's friendly question as to how he was doing, as opposed to during a medical triage or in the inmate kiosk system, that "I feel like an elephant is on my chest, *but other than that, I'm okay*."

Plaintiff asserts that Looney's interpretation of that casual response being that Sweet was "fine" and his subsequent failure to report said comment up the chain of command

8

constituted a violation of Sweet's constitutional rights. However, Officer Looney's interpretation of that comment as being that Sweet was fine was objectively reasonable, especially in light of the fact that Sweet was already in medical segregation being monitored by supervisors with advanced medical training, as well as medical staff, Looney did not observe him breathing heavily, Looney did not observe him have difficulty walking, Looney did not observe him having difficulty changing clothes, Looney did not see Sweet sweating, Looney did not see him discolored, Sweet did not ask to see a doctor, Sweet did not ask to go to the hospital, Sweet did not ask to see a nurse, Sweet did not ask for medical treatment, Sweet did not ask for medication and Sweet knew how to ask for things because he asked Looney for a pillow. He did not see Sweet lean over and rub his chest as is depicted on the video, as he was busy retrieving a jumpsuit. Most importantly, Sweet's own words were that he was "okay."

While Looney was likely aware from the pass-on logs and his pat-down of Sweet that Sweet was on blood pressure medications and being monitored for blood pressure, Sweet had been given his prescribed medications and via the segregation blotter Looney completed, had just been seen by medical staff less than three hours earlier. Therefore, it was not objectively unreasonable for Looney to take Sweet at his word that he was "fine."

Looney's actions in this case were not objectively unreasonable, nor did he act purposefully, knowingly or recklessly when considering consequences of handling Sweet's case. Looney conduct cannot be considered reckless as he observed Sweet to have no difficulty engaging, walking or changing his clothes. Sweet presented no physical signs or symptoms of distress, in that he was not sweating, breathing heavily or discolored. Sweet did not request medical assistance from a nurse, doctor or hospital. Sweet did not request assistance from medication. Sweet knew how to request assistance as he had done so on

previous occasions which resulted in the shift supervisors contacting medical staff and then medical staff coming to see him and Sweet did not do so when he interacted with Looney. Looney's conduct in not advising his shift supervisor or medical of Sweet's remark cannot be considered reckless or purposeful and at best would be mere negligence which does not rise to the level of a constitutional violation.

> **B.** Additionally, Looney's conduct was not objectively unreasonable. Looney has the right to rely on medical professionals who had seen Sweet hours previously. Looney's own personal observation of Sweet also does not support that his conduct was objectively unreasonable. As previously stated, Sweet did not request medical assistance and Looney denied it. Sweet was not showing signs of distress outside of that comment and given Looney's observation of Sweet it was not objectively unreasonable to fail to advise the shift supervisor or medical of Sweet's comment. As such, his conduct was constitutionally adequate and he is entitled to Judgment as a matter of law.**Looney is Entitled to Qualified Immunity.**

Assuming *arguendo* that a question of fact exists regarding whether Looney's actions were objectively unreasonable, he is still entitled judgment as a matter of law because he is protected by qualified immunity. "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (citations omitted). "A state official is protected by qualified immunity unless the plaintiff shows: (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Kemp v. Liebel*, 877 F.3d 346, 350–51 (7th Cir. 2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)) (quotation marks omitted). To be "clearly established," a right must be "sufficiently clear that every reasonable official would have understood that what he is doing violates that right[.]" *Id.* at 351 (citations and quotation marks omitted).

The plaintiff bears the burden of defeating the qualified immunity claim. *Betker v. Gomez*, 692 F.3d 854, 860 (7th Cir. 2012). Plaintiff can defeat qualified immunity by

"identifying a closely analogous case or by persuading the court that the conduct is so egregious and unreasonable that, notwithstanding the lack of an analogous decision, no reasonable officer could have thought he was acting lawfully." *Abbott v. Sangamon Cty., Ill.*, 705 F.3d 706, 723-24 (7th Cir. 2013). While Plaintiff need not point "to an identical case finding the alleged violation unlawful ... existing precedent must have placed the statutory or constitutional question beyond debate." *Kemp*, 877 F.3d at 351 (quoting *Mullenix v. Luna*, 136 S.Ct. 305, 308, (2015)) (quotation marks omitted). Qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *Lovett v. Herbert*, 907 F.3d 986, 991 (7th Cir. 2018). Courts have discretion to find immunity exists on the basis that the right was not clearly established, without determining whether there was a violation in the first place. *Abbott*, 705 F.3d at 713 (citing *Pearson v. Callahan,* 555 U.S. 223, 227 (2009)). The Supreme Court has "repeatedly told courts ... not to define clearly established law at a high level of generality." *Kisela v. Hughes*, 138 S.Ct. 1148, 1152 (2018). "The dispositive question is whether the violative nature of *particular* conduct is clearly established." *Lovett*, 907 F.3d at 992 (quoting *Mullenix*, 136 S.Ct. at 308) (emphasis in original). Specificity is important because it can be difficult for an officer to determine how the relevant doctrine will apply to the factual situation at hand. *Id.*

In this case, Plaintiff cannot meet its burden to show a reasonable officer in Looney's position would have known he was acting unlawfully. While Sweet has a general right under the Due Process Clause to receive objectively reasonable medical care, the application of that right in this context does not demonstrate violation of clearly established law. There is no case law to provide notice to Looney that failing to recognize a general statement that Sweet "felt like he had an elephant on his chest" but was "alright" as a medical emergency that necessitated reporting it up the chain of command, as opposed to a

11

general statement made by a pre-trial detainee—i.e., a population that regularly complains about chest pain that is usually attributable to anxiety. *See* Hoke p. 95 ll. 10-25. Additionally, all of the other facts available to Looney at the time failed to warrant different action from Looney. Sweet did not appear to be in distress as he was able to walk, talk and change clothes without apparent stress. Sweet did not ask for medical assistance in the form of a nurse visit, doctor visit or trip to the hospital. Sweet did not complain about anything else. Also, Looney's interpretation of Sweet's off-the-cuff remark that he was fine is reasonable given that the segregation blotter (which Looney completed close to this encounter) showed Sweet had just been evaluated by medical. Looney reasonably relied upon the fact that Sweet had been treated by medical staff and safely returned to medical confinement.

Based on the foregoing, Looney did not violate Sweet's constitutional right, let alone a "clearly established" constitutional right and he is entitled to Judgment as a matter of law.

## CONCLUSION

No genuine issue of material fact exists and Defendant, Michael Looney is entitled to Judgment as a matter of law.

Respectfully submitted,

KIGHTLINGER & GRAY, LLP

By:   s/ R. Jeffrey Lowe
R. Jeffrey Lowe, Atty. #21508-22
KIGHTLINGER & GRAY, LLP
Bonterra Building, Suite 200
3620 Blackiston Boulevard
New Albany, IN 47150
jlowe@k-glaw.com
Phone: (812) 949-2300
Fax: (812) 949-8556
*Counsel for Defendants, Sheriff Jamey Noel,*
*Michael Hammond and Michael Looney,*
*Clark County Sheriff's Department*

## **CERTIFICATE OF SERVICE**

I hereby certify that on the **16th day of July, 2020,** a copy of the foregoing Memorandum in Support of Sheriff Noel's Motion for Summary Judgment was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Laura E. Landenwich
Adams, Landenwich Walton, PLLC
517 W. Ormsby Avenue
Louisville, KY 40203
laura@justiceky.com
*Counsel for Plaintiff*

Tracy S. Prewitt
O'Bryan, Brown & Toner, PLLC
401 S. 4th Street, Suite 2200
Louisville, KY 40202
tprewitt@obtlaw.com
*Counsel for Defendants,*
*Charlestown Primary Care, LLC*
*and William Hoke, M.D.*

                                                s/R. Jeffrey Lowe
                                                R. Jeffrey Lowe
                                                KIGHTLINGER & GRAY, LLP

194026\60368541-1